## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Brian J. Haddick, | Court File No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| | **(JURY TRIAL DEMANDED)** |
| McNeilus Truck and Manufacturing, Inc. and Oshkosh Corporation, | |
| Defendants. | |

Plaintiff Brian Haddick, by and through his attorneys of Nichols Kaster, PLLP, states the following as to his claims against McNeilus Truck and Manufacturing, Inc. and Oshkosh Corporation:

### PARTIES

1. Plaintiff Brian Haddick is an individual person who resides and is domiciled in Rochester, Minnesota.

2. Defendant McNeilus Truck and Manufacturing, Inc. ("McNeilus") is a Minnesota corporation. Its principal executive address is 524 Highway Road 34 NE, Dodge Center, Minnesota 55927. McNeilus is a subsidiary of Defendant Oshkosh Corporation.

3. Defendant Oshkosh Corporation is a Wisconsin corporation. Its principal office is located at 2307 Oregon Street, Oshkosh, Wisconsin 54902. According to the company website: "Oshkosh Corporation designs and builds the world's toughest

1

specialty trucks and truck bodies and access equipment by working shoulder-to-shoulder with the people who use them." And McNeilus is one of its "major brands."

4.    At all times relevant to this Complaint, Plaintiff was an employee of Defendants.

## JURISDICTION AND VENUE

5.    This Court has original jurisdiction of this action under 28 U.S.C. § 1331, because one of Plaintiff's claims arises under the laws of the United States.

6.    This Court has supplemental jurisdiction of Plaintiff's state claims in this action under 28 U.S.C. § 1367(a) because the unlawful actions underlying the claims are part of the same case or controversy as those over which the Court has original jurisdiction.

7.    This Court has personal jurisdiction over Defendants, and venue is proper in this Court under 28 U.S.C. § 1391, because Plaintiff resides in Minnesota, Defendants reside and/or conduct significant business in Minnesota, and the illegal conduct giving rise to this Complaint occurred in Minnesota.

## FACTUAL ALLEGATIONS

### Brian Haddick and His Career as a Mechanical Engineer

8.    Plaintiff Brian Haddick grew up in Bloomington, Minnesota.

9.    In 1991, he graduated from the University of Minnesota with a degree in mechanical engineering. He spent the past quarter-century as an engineer—much of it designing structural parts for large vehicles, including tractors and heavy-duty trucks.

2

10. Throughout his career as an engineer, Haddick has pursued additional education (including MBA coursework), training, and certifications (including 6 Sigma Green Belt).

11. Between 2003 and 2013, Haddick lived in Washington state where he worked as a Project Engineer and Senior Project Engineer for PACCAR Inc. At PACCAR, Haddick worked on the design and development of structural components for heavy-duty diesel trucks. Throughout his employment at PACCAR, Haddick consistently received high marks for his performance.

12. In early 2014, Haddick moved back to Minnesota for family reasons. Around the same time, he began employment as a Senior Engineer at Crenlo, LLC. At Crenlo, Haddick worked on the design and development of operator cabs and roll-over protective structures.

*Haddick Begins Employment with Defendants*

13. In late 2014, in pursuit of better compensation, Haddick applied for a Senior Project Engineer position with Defendants McNeilus Trucking and Manufacturing, Inc. and Oshkosh Corporation ("Defendants"). Defendants offered Haddick the position; he accepted; and he began employment in early 2015.

14. Haddick was assigned to work on the design and development of various end-use additions to large refuse vehicles. For example, he worked on carry-cans for garbage and recycling trucks.

15. Haddick's direct supervisor was Chief Engineer Emily Davis ("Davis").

*Haddick Begins Reporting Potential Violations of Federal Law*

16.    The National Highway Traffic Safety Administration ("Safety Administration") is part of the United States Department of Transportation.

17.    The Safety Administration is charged with saving lives and preventing injuries by reducing vehicle-related crashes. To this end, the Safety Administration writes and enforces Federal Motor Vehicle Safety Standards ("FMVSSs") under the authority of the National Traffic and Motor Vehicle Act of 1966, codified at 49 U.S.C. Chapter 301.

18.    As a final-stage manufacturer, Defendants receive bare, unfinished trucks from chassis manufacturers. Defendants then make various additions to the trucks to make them ready for service in the Refuse Industry.

19.    In addition to receiving the trucks, Defendants also receive a variety of chassis Original Equipment Manufacturing ("OEM") Incomplete Vehicle Document ("IVD") specifications from the chassis manufacturer.

20.    Chassis OEM IVD specifications are meant to ensure that additions to trucks made by final-stage manufacturers, like Defendants, comply with the federal safety standards (i.e., the FMVSSs).

21.    In May 2015, McNeilus assigned Haddick to work on its Automated Fronted Loader ("AFL") Carry Can Project.

22.    Around July 2015, Haddick learned that the company's design of its AFL Carry Can did not consider what effect adding the can to trucks would have on their weight-distribution and the location of their center of gravity.

4

23. As a result, Haddick grew concerned that the AFL Carry Can might not comply with the chassis manufacturer's OEM IVD specifications, and, thus, might be in violation of applicable federal safety standards, including FMVSS 121.

24. Worse yet, Haddick also believed that the weight-distribution problem might be so significant that it could result in roll-overs or other accidents involving McNeilus trucks.

25. In or around August 2015, Haddick began investigating these concerns by using the SolidWorks 3d Computer Aided Design program to evaluate issues related to the weight-distribution problem (including, e.g., effects on trucks' center of gravity).

26. When the preliminary data corroborated Haddick's concerns, he immediately reported them to Davis and recommended further study of the weight-distribution problem.

27. In response, Davis acted as though she and others at McNeilus were unfamiliar with the federal safety standards in question and any potential violations related to weight-distribution.

28. Around this time, Haddick learned about a roll-over accident involving a McNeilus truck in Lodi, California. He later found out that the truck-model in the accident was one of many at McNeilus that were likely noncompliant.

29. In or around September 2015, Haddick began attending bi-weekly meetings regarding the potential weight-distribution problem. Also in attendance at these meetings were Davis, Chris Boyce (Director of Testing and Development), Angela Beres (Chief

Engineer of Safety and Compliance), Timothy Ackman (Davis's supervisor and Director of Engineering – Refuse), and Mathew Deinema (Designer – Chassis OEM Integration).

30.     After a review of multiple McNeilus models revealed that its trucks might be top-heavy when fully loaded, the group agreed to let Haddick and others continue investigating the weight-distribution problem.

31.     Haddick continued investigating the weight-distribution problem throughout October and November 2015. In early November, however, he received an uncharacteristically negative performance review from Davis and Ackman.

32.     In the written review, Davis referred to Haddick's struggle to gain an "understanding and acceptance of the culture at McNeilus." Ackman agreed and criticized Haddick for "challenging the status quo."

33.     When Haddick asked Davis and Ackman for specifics, both referred to his work on the weight-distribution problem.

34.     In particular, Ackman asked Haddick how PACCAR (his previously employer) would have handled the weight-distribution problem.

35.     Then, explaining his reluctance to properly address the weight-distribution problem at McNeilus and Oshkosh, Ackman stated: "I'm going to take on something I can't win."

36.     In or around early December 2015, Haddick gave a PowerPoint presentation regarding potential FMVSS compliance concerns to the AFL Carry Can project team. In his presentation, Haddick identified several potentially serious safety and compliance violations. He also proposed possible corrections.

37.    The team did not receive the news with enthusiasm. For example, Bryan Datema, Director of Engineering, told Haddick to change the color of certain text in his PowerPoint document from red to orange, because, after all, the trucks could turn out to be compliant.

38.    Several people at the presentation said that the company's Sales and Marketing Department would refuse to make any of the corrections Haddick was proposing.

39.    Between December 2015 and January 2016, Haddick requested additional information from the Oshkosh Simulation Group regarding estimated stopping distances for several models. This data further corroborated Haddick's concerns.

40.    Around the same time, Haddick learned that his concerns about the weight-distribution were not being communicated to Oshkosh corporate executives, including Chris Yakes (Interim Vice President of Commercial Engineering) and Rob Messina (Senior Vice President – Engineering and Technology).

41.    Accordingly, Haddick reported the weight-distribution problem to Yakes and Messina. In so doing, he also told them about the negative performance review and his belief that it was retaliation for raising and working on the weight-distribution problem. Neither Yakes nor Messina ever followed up with Haddick regarding the weight-distribution problem or retaliation.

*McNeilus Lays Groundwork to Terminate Haddick*

42.    In or around February 2016, Davis told Haddick to stop working on the weight-distribution problem. She told him that she was going to have somebody else

7

continue the work. In place of the weight-distribution problem, Davis began assigning small, miscellaneous projects to Haddick.

43.    In or around April 2016, Datema asked Haddick to help respond to an inquiry from Transport Canada (i.e., the Canadian Department of Transportation). Canada was investigating a fire incident involving a McNeilus truck.  Canada had requested a full disclosure of this vehicle's compliance with the FMVSS/CMVSS (Canadian Motor Vehicle Safety Standards), including vehicle weight-distribution regulations.

44.    When Haddick's initial results came back unfavorable to McNeilus, Datema intervened and asked Haddick if there was a way to make the numbers look better. Haddick told him that modifying certain initial assumptions in his simulator might achieve this. After modifying the assumptions, McNeilus apparently reported the more favorable results to Canada.

45.    Around the same time, Davis asked Haddick to draw up another PowerPoint presentation on the weight-distribution problem for newly hired Vice President of Commercial Engineering, Todd Craft ("Craft"), who was unfamiliar with FMVSS vehicle compliance.

46.    In the presentation, after further refinement of the data, Haddick again found that there were serious safety and compliance problems with several McNeilus trucks.

47.    Throughout May and June 2016, Haddick continued working on the weight-distribution problem. In addition to looking at problems with safety and

8

compliance, he also worked on getting a patent for a new and compliant design of the AFL Carry Can.

48.    Around the same time, Haddick learned that McNeilus had entered into a contract with Perkins Manufacturing Company for the use of its design of a similar carry can.

49.    On information and belief, McNeilus obtained exclusive rights to the Perkins design for five years in exchange for not competing in the marketplace. By Haddick's calculations, however, the Perkins design was even heavier than the design McNeilus had been using.

50.    On information and belief, the Commercial Leadership Team at McNeilus met in or around the end of June 2016 to discuss what to do about the weight-distribution problem.

51.    Around the same time, Davis put Haddick on a 90-day performance improvement plan (or PIP). As justification for the PIP, Davis falsely accused Haddick of not meeting project deadlines. In addition, she told him that the PIP was related to his continuing to make the weight-distribution problem a "priority" even though he had been told otherwise.

52.    The PIP included unrealistic expectations and warned that Haddick would be terminated if he did not meet them. Around the same time, McNeilus Human Resources told Haddick to start looking for another job.

53. A coworker told Haddick that the PIP was obvious retaliation for his reports and work on the weight-distribution problem. This individual had heard of others in the past being reprimanded on similar grounds.

54. In or around early September 2016, the entire McNeilus Project Management Team was terminated, so Davis, as instructed by Craft, assigned yet more work on top Haddick's already unrealistic PIP. When asked how she expected him to meet the requirements of his PIP, Davis told him to "adapt."

55. On September 29, 2016, McNeilus terminated Haddick for purportedly failing to meet the requirements of his 90-day PIP. A security guard escorted him out of the building and told him to leave the premises.

## CAUSES OF ACTION

## COUNT I
### Retaliation in Violation of 49 U.S.C. § 30171

56. Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

57. 49 U.S.C. § 30171(a) provides that: "No motor vehicle manufacturer, part supplier, or dealership may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee):

(1) provided, caused to be provided, or is about to provide (with any knowledge of the employer) or cause to be provided to the employer or the Secretary of Transportation information relating to any motor vehicle defect,

10

noncompliance, or any violation or alleged violation of any notification or reporting requirement of this chapter;

(2)  has filed, caused to be filed, or is about to file (with any knowledge of the employer) or cause to be filed a proceeding relating to any violation or alleged violation of any motor vehicle defect, noncompliance, or any violation or alleged violation of any notification or reporting requirement of this chapter;

(3)  testified or is about to testify in such a proceeding;

(4)  assisted or participated or is about to assist or participate in such a proceeding; or

(5)  objected to, or refused to participate in, any activity that the employee reasonably believed to be in violation of any provision of chapter 301 of this title, or any order, rule, regulation, standard, or ban under such provision."

58.  Plaintiff engaged in protected activity by investigating, reporting, and opposing Defendants' noncompliance or suspected noncompliance with the FMVSSs, and, in particular, FMVSS 121.

59.  Defendants discharged and otherwise discriminated against Plaintiff.

60.  Plaintiff's protected activity as described above was a contributing factor in Plaintiff's discharge and discrimination.

61.  Defendants would not have discharged and otherwise discriminated against Plaintiff had he not engaged in the above protected activity.

62.     As a result of Defendants' unlawful discharge and discrimination, Plaintiff has suffered and continues to suffer significant economic loss and emotional distress.

63.     Plaintiff is entitled to affirmative action to abate Defendants' violation, including but not limited to: reinstatement or front pay in lieu of reinstatement; back pay and other economic losses; and compensatory damages for emotional distress, humiliation, loss of reputation, and other harm.

64.     Plaintiff is also entitled to recover his reasonable attorneys' fees, expert fees, and costs associated with this case.

## COUNT II
### Retaliation in Violation of the MWA
### Minn. Stat. §§ 181.931 *et. seq.*

65.     Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

66.     The MWA provides that it is unlawful for an employer to "discharge, discipline, threaten, otherwise discriminate against, or penalize an employee" because the employee "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. 1(a).

67.     Plaintiff reported in good faith an actual, suspected, or planned violation of law when he investigated, reported, and opposed Defendants' apparent noncompliance with the FMVSSs, and, in particular, FMVSS 121. This was protected activity under the MWA.

68.     Defendants discharged, disciplined, and/or otherwise discriminated against Plaintiff by, among other things, putting him on a performance improvement plan and terminating his employment. These were adverse employment actions under the MWA.

69.     Plaintiff's protected activity as described above was a motivating factor in Defendants' decisions to take the above adverse employment actions against him.

70.     As a result of Defendants' unlawful conduct, Plaintiff has suffered loss of income, mental anguish and emotional distress, humiliation, loss of reputation and other damages in excess of $50,000.

71.     Plaintiff is also entitled to costs, disbursements and reasonable attorneys' fees incurred herein under Minn. Stat. § 181.935.

### REQUEST FOR RELIEF

1.     Plaintiff requests that the Court find that Defendants acted in violation of 49 U.S.C. § 30171 and Minn. Stat. §§ 181.931 *et. seq.* when they discharged and otherwise discriminated against him.

2.     Plaintiff further requests that the Court order Defendants to:

    a. Pay to Plaintiff an award of back pay for lost income, benefits, and other economic losses;

    b. Pay to Plaintiff an award of front pay for continuing loss of income, benefits, and other economic losses in lieu of reinstatement;

    c. Pay to Plaintiff an award for compensatory damages for emotional distress, humiliation, and other such harm;

    d. Pay to Plaintiff an award for attorneys' fees, costs (including litigation expenses and expert costs), disbursements; and

    e. Pay to Plaintiff an award for punitive damages or permit him to seek leave

to add a claim for punitive damages as allowed by law;

3.   Grant Plaintiff any other relief available at law, or that the Court deems equitable and just.

Dated: December 1, 2017            **NICHOLS KASTER, PLLP**

s/Matthew A. Frank
Steven Andrew Smith (#260836)
Matthew Alan Frank (#0395362)
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
smith@nka.com
mfrank@nka.com

**ATTORNEYS FOR PLAINTIFF**

14